IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-119

No. 228A21

Filed 16 December 2022

C INVESTMENTS 2, LLC

v.

ARLENE P. AUGER, HERBERT W. AUGER, ERIC E. CRAIG, GINA CRAIG, LAURA DUPUY, STEPHEN EZZO, JANICE HUFF EZZO, ANNE CARR GILMAN WOOD, as Trustee of the FRANCIS DAVIDSON GILMAN, III TRUST fbo PETS UW dated June 20, 2007, LAUREN HEANEY, GINNER HUDSON, JACK HUDSON, ARTHUR MAKI, RUTH MAKI, JENNIE RAUBACHER, MATTHEW RAUBACHER, as Co-Trustees of the RAUBACHER/CHEUNG FAMILY TRUST dated November 11, 2018, JEFFREY STEGALL, VALERIE STEGALL, and C INVESTMENTS 4, LLC

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 277 N.C. App. 420, 2021-NCCOA-209, affirming an order of summary judgment entered on 8 April 2019 by Judge Charles M. Viser in Superior Court, Mecklenburg County. The Court allowed defendants' petition for discretionary review as to additional issues. Heard in the Supreme Court on 19 September 2022.

*Parker Poe Adams & Bernstein, LLP, by Michael G. Adams, Morgan H. Rogers, and W. Coker Holmes, for plaintiff-appellee, C Investments 2, LLC, and substituted party C Investments 4, LLC.*

*Davies Law Firm, PLLC, by Kenneth T. Davies; Robinson, Bradshaw & Hinson, P.A., by Richard A. Vinroot; and Nexsen Pruet, PLLC, by James C. Smith, for defendant-appellants, Arlene P. Auger, Herbert W. Auger, Eric E. Craig, Gina D. Craig, Stephen Ezzo, and Janice Huff Ezzo.*

*Caudle & Spears, P.A., by Christopher P. Raab and L. Cameron Caudle, Jr., for defendant-appellees Jennie Raubacher and Matthew Raubacher, as Co-Trustees of the Raubacher/Cheung Family Trust dated November 11, 2008.*

*Roberts & Stevens, P.A., by Kenneth R. Hunt and Wyatt S. Stevens, for Jon R. Bellows, Galliard S. Bellows, Thomas A. Schieber, Elizabeth G. Schieber, William L. Everist, Mary K. Everist, Daniel P. Comer, Meredith M. Comer, James S. O'Brien, Gisselle L. O'Brien, Sara Edmonds Green, Rebecca D. Tucker, Tony L. Wilkey, Diana M. Wilkey, Kenneth R. Hunt, and Shannon U. Hunt; and J. Boone Tarlton and Ervin L. Ball, Jr. for Wayne S. Stanko, and Janice Stanko, amici curiae.*

*Jordan Price Wall Gray Jones & Carlton, PLLC, by H. Weldon Jones, III, for Community Associations Institute, amicus curiae.*

*Offit Kurman, P.A., by Zipporah Basile Edwards and Robert B. McNeill, for North Carolina Land Title Association, amicus curiae.*

*Roberson Haworth & Reese, PLLC, by Alan B. Powell and Andrew D. Irby, for Lori H. Postal, amicus curiae.*

*Alexander Ricks, PLLC, by Amy P. Hunt, for Michael and Karyn Reardon, amici curiae.*

*Edmund T. Urban for Urban Title Company, Inc. and pro se, amici curiae.*

*Davies Law Firm, PLLC, by Kenneth T. Davies, for C. E. Williams, III, Margaret W. Williams, R. Michael James, Katherine H. James, Strawn Cathcart, Susan S. Cathcart, Mark B. Mahoney, and Noelle S. Mahoney; Robinson, Bradshaw & Hinson, P.A., by Richard A. Vinroot, pro se, and for Judith A. Vinroot; and Nexsen Pruet, PLLC, by James C. Smith, for Thomas M. Belk, Sarah F. Belk, D. Steve Boland, Katrice C. Boland, Shippen Browne, Bridget Browne, Joseph D. Downey, Kristen L. Downey, Jubel A. Early, Katherine C. Early, John K. Hudson, Carolyn B. Hudson, John Ames Kneisel, Anna Blair Kneisel, Alexander W. McAlister, Susan N. McAlister, Ian McDade, Victoria L. McDade, Mark William Mealy, Rose Patrick Mealy, Walter O. Nisbet, Danielle F. Nisbet, Scott John Rogers Smith, Mary Mallard Smith, G. Kennedy Thompson, Kathylee B. Thompson, George C. Ullrich, Margaret C. Ullrich, John R. Wickham, Charlotte H. Wickham, William S. Wilson, Ellen G. Wilson, Landon R. Wyatt, and Edith H. Wyatt, amici curiae.*

MORGAN, Justice.

¶ 1　　In this case we are called upon to determine the proper interpretation of North Carolina's Real Property Marketable Title Act, N.C.G.S. §§ 47B-1 to 47B-9 (2021) and its thirteenth enumerated exception. *See* N.C.G.S. § 47B-3(13). Defendants appeal from a divided Court of Appeals decision, which affirmed the trial court's grant of summary judgment to plaintiff and held that eight of the nine restrictive covenants governing plaintiff's lots within the parties' residential subdivision were extinguished by operation of the Act. Our review in this matter concerns whether the Court of Appeals correctly determined that the Act's thirteenth exception did not apply to save *all* of the nine restrictive covenants. By applying this Court's well-established principles of statutory construction and affording the Legislature's words their plain and unambiguous meaning, we conclude that the eight covenants at issue do not fall within the scope of the Act's exceptions and are therefore extinguished by operation of law. Accordingly, we affirm the opinion of the Court of Appeals.

## I.　Factual and Procedural Background

¶ 2　　Country Colony is a residential subdivision located in Mecklenburg County, North Carolina, which was developed by husband and wife Henry G. and Miriam C. Newson in the 1950s. On 25 February 1952, prior to selling any parcels within Country Colony, the Newsons recorded nine restrictive covenants at the Mecklenburg County Register of Deeds which were intended to govern the subsequent development of the subdivision. These covenants were recorded in Book 1537 at page 517 and

specified that they were to run with the land and remain binding on any and all subsequent parties and persons. The Newsons further provided that any lot owner within Country Colony could enforce the restrictions through proceedings at law or in equity against any other property owner in violation thereof. The covenants require that:

> 1. All lots in the tract shall be known and described and used for residential lots only.
>
> 2. No structure shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage, and other outbuildings incidental to residential use of the plot.
>
> 3. No building shall be erected on any residential building plot nearer than 100 feet to the front lot line nor nearer than 20 feet to any side line.
>
> 4. No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.
>
> 5. No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.
>
> 6. No dwelling costing less than $10,000.00 shall be permitted on any lot in the tract. The ground floor area of the main structure, exclusive of one story open porches and open car ports, shall be not less than 1200 square feet in case of a one story structure. In the case of a one and one-half, two or two and one-half story structure, the ground floor area of the main structure, exclusive of one-story open porches or open car ports, shall not be less than nine

hundred square feet. (It being the intention to require in each instance the erection of such a dwelling as would have cost not less than the minimum cost provided if same had been erected in January, 1952.)

7. A right of way is and shall be reserved along the rear of each lot and along the side line of each lot where necessary, for pole lines, pipes and conduits for use in connection with the supplying public utilities service [sic] to the several lots in said development.

8. In the event of the unintentional violation of any of the building line restrictions herein set forth, the parties hereto reserve the right, by and with the mutual written consent of the owner or owners, for the time being of such lot, to change the building line restrictions set forth in this instrument; provided, however, that such change shall not exceed ten percent of the original requirements of such building line restrictions.

9. None of the lots shown on said plat shall be subdivided to contain less than two acres and only one residence shall be erected on each of said lots.

¶ 3        Plaintiff is a North Carolina limited liability company that owns seven parcels within Country Colony, which it purchased between February 2016 and May 2017. Each parcel has a root title more than thirty years old that either entirely fails to mention, or does not specifically raise by reference to book and page or record, the aforementioned restrictive covenants. Neither is such information provided by any of the deeds subsequently contained within plaintiff's chains of title.

¶ 4        On 28 June 2018, plaintiff filed a complaint in Superior Court, Mecklenburg County, requesting declaratory relief regarding the validity and enforceability of the above covenants. Plaintiff argued, *inter alia*, that many of the covenants as applied

to plaintiff's lots are invalid under the North Carolina Real Property Marketable Title Act, N.C.G.S. §§ 47B-1 to 47B-9 (2021), which provides that any conflicting claims placed upon one's title to real property in North Carolina shall be extinguished if not recorded within the chain of record title going back thirty years, subject to certain exceptions. Two named defendants, Lawrence and Laura Tillman, who sought to sell their own property within Country Colony for development, filed an answer, counterclaim against plaintiff, and crossclaims against all other defendants seeking identical relief on 13 July 2018. Defendants Jennie and Matthew Raubacher filed an answer to plaintiff's complaint and demand for jury trial on 2 August 2018, as well as an answer to the Tillmans' crossclaim on 28 September 2018. Defendant Lauren Heaney submitted her own answers to the complaint and crossclaim on 3 August 2018 and 16 August 2018, respectively, and defendants Herbert Auger, Arlene Auger, Eric Craig, Gina Craig, Janice Huff Ezzo, Stephen Ezzo, Laura Dupuy, Ashfaq Uraizee, and Jabeen Uraizee (Auger defendants) filed an answer to the Tillmans' crossclaim and a motion to dismiss on 31 August 2018.

¶ 5 On 6 September 2018, plaintiff filed a motion for leave to amend its complaint, followed by an amended complaint filed on 26 October 2018, in order to join additional parties, properly identify the owners of a lot, and further clarify its argument relating to the Marketable Title Act. The Tillmans likewise amended their answer, counterclaim, and crossclaim on 1 November 2018. Following this, the Raubachers

and the Auger defendants filed updated answers to plaintiff's amended complaint as well as the Tillmans' amended crossclaim between 19 November 2018 and 14 December 2018. Newly added defendant Anne Carr Gilman Wood, in her capacity as Trustee of the Francis Davidson Gilman, III Trust, filed an answer and affirmative defenses to plaintiff's amended complaint on 7 December 2018; likewise, Jeffrey and Valerie Stegall filed an answer and affirmative defenses to both plaintiff's amended complaint and the Tillmans' amended crossclaim on 4 January 2019. The remaining defendants defaulted by failing to timely respond to either plaintiff's complaint or the Tillmans' crossclaim.

¶ 6 On 20 December 2018, the Auger defendants filed a motion for summary judgment. Plaintiff and the Tillmans filed opposing motions for summary judgment on 21 December 2018, requesting that the trial court find that they held marketable title free and clear of all of the Newson covenants under the operative provisions of the Marketable Title Act. In support of their motions, plaintiff and the Tillmans each filed certified copies of their deeds establishing chains of title going back more than thirty years without reference to the Newson covenants. The Auger defendants submitted a memorandum in opposition to plaintiff's and the Tillmans' motions on 31 January 2019, arguing that the Newson covenants were validly created and not terminated by operation of the Marketable Title Act.

¶ 7 On 8 April 2019, the trial court entered an order granting plaintiff's and

Tillman defendants' motions for summary judgment, finding that the Act operated to extinguish all but the first of the Newsons' restrictive covenants as applied to plaintiff's and the Tillmans' property. N.C.G.S. § 47B-2(c). The trial court found that none of the Act's thirteen enumerated exceptions applied to preserve these covenants, except for the first covenant, which restricted the subject property to use for residential lots only. Defendants appealed to the Court of Appeals, arguing that the trial court had erred by concluding that N.C.G.S. § 47B-3(13), which provides an exception for "[c]ovenants applicable to a general or uniform scheme of development which restrict the property to residential use only," did not additionally shield covenants two through nine from the extinguishment provisions of the Act.

¶ 8        The Court of Appeals affirmed the trial court's grant of summary judgment in favor of plaintiff and the Tillmans. *C Invs. 2, LLC v. Auger*, 277 N.C. App. 420, 2021-NCCOA-209. In its opinion, the Court of Appeals majority held that eight of the nine covenants at issue—which largely govern the type, location, and appearance of structures that can be erected on property within Country Colony—did not fit within the plain language of N.C.G.S. § 47B-3(13) which, according to the lower court's interpretation, exempts only covenants "concerning residential use, or more narrowly, multi-family or single-family residential use." *C Invs. 2*, ¶ 5. The Court of Appeals dissent agreed with the majority that most of the Country Colony covenants did not survive operation of the Act, but disagreed that the plain language of N.C.G.S.

§ 47B-3(13) was unambiguous. Distinguishing our precedent construing residential use covenants otherwise, the dissenting judge concluded that N.C.G.S. § 47B-3(13) covers not only covenants restricting property to residential *use*, but also applies to the *construction* of particular residential structures. *Id.*, ¶ 44 (Dillon, J., concurring in part, dissenting in part). Consequently, the dissent concluded that not only the first, but also the second and ninth covenants, ought to be shielded from extinguishment under the provisions of the Act. *Id.*

¶ 9         Defendants timely appealed to this Court pursuant to N.C.G.S. § 7A-30 on the basis of the Court of Appeals dissent.[1] We further allowed defendants' petition for discretionary review to consider whether N.C.G.S. § 47B-3(13) excepts covenants three through eight as well from extinguishment by operation of the Act.

## II.    Analysis

¶ 10         The question before this Court is which, if any, of Country Colony's restrictive covenants fall within the purview of N.C.G.S. § 47B-3(13) and are thus shielded from the extinguishment provisions of the Real Property Marketable Title Act. After careful consideration of the Act's plain words and legislative history, as well as our own precedent interpreting substantially identical language, we conclude that only the first of the nine covenants at issue survives operation of the Act. We therefore

---

[1] The appealing defendants were Arlene and Herbert Auger, Eric and Gina Craig, Stephen and Janice Ezzo, and Ashfaq and Jabeen Uraizee. The Uraizees later withdrew from the proceedings after they sold their property.

affirm the decision of the Court of Appeals.

¶ 11        We begin with an identification of the proper standard of review. Defendants are appealing an order of summary judgment granted by the trial court and affirmed by the Court of Appeals. "Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573 (2008) (extraneity omitted). In reviewing an order for summary judgment, we view presented evidence in the "light most favorable to the nonmoving party." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). Finally, we review matters of statutory interpretation de novo. *In re Ernst & Young, LLP*, 363 N.C. 612, 616 (2009).

¶ 12        This case presents a question of statutory interpretation of first impression before this Court, which warrants a review of our pertinent tenets of construction. "According to well-established North Carolina law, the intent of the Legislature controls the interpretation of a statute." *State v. Fletcher*, 370 N.C. 313, 327–28 (2017) (extraneity omitted). "[W]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give [the statute] its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." *Union Carbide Corp. v. Offerman*, 351 N.C. 310, 315 (2000) (second alteration in original) (quoting *State v. Camp*, 286

N.C. 148, 152 (1974)). "But where a statute is ambiguous, judicial construction must be used to ascertain the legislative will." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990). Legislative will "must be found from the language of the act, its legislative history and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied." *State ex. rel. N.C. Milk Commission v. Nat'l Food Stores, Inc.*, 270 N.C. 323, 332 (1967).

¶ 13    The statute before us in the present case is North Carolina's Real Property Marketable Title Act. The Act declares that, as a matter of public policy, land is a "basic resource of the people of the State of North Carolina" that "should be made freely alienable and marketable so far as is practicable." N.C.G.S. § 47B-1(1). Accordingly, the Act states that, "if a person claims title to real property under a chain of record title for 30 years, and no other person has filed a notice of any claim of interest in the real property during the 30-year period, then all conflicting claims based upon any title transaction prior to the 30-year period shall be extinguished," subject to certain limited exceptions. *Id*. § 47B-1.

¶ 14    It is undisputed that plaintiff traces its interest in seven lots within Country Colony to root titles going back at least thirty years without reference to the Newson covenants.[2] The resolution of the instant case hinges upon the proper interpretation

---

[2] The Tillmans sold their property to C Investments 4 in December 2021. C Investments 4 has been substituted as a party in place of the Tillmans, Uraizees, Julkas, and

of one of the Act's exceptions. Subsection 47B-3 establishes that:

> Such marketable record title shall not affect or extinguish the following rights:
>
> . . . .
>
> (13) Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable. The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B.

*Id.* § 47B-3(13).

¶ 15     Country Colony is indisputably governed by a series of protective covenants that provide for a general or uniform scheme of development as envisioned by its developers, the Newsons. Defendants urge us to interpret N.C.G.S. § 47B-3(13) as meaning that, if a collection of covenants governing a general or uniform scheme of development includes a restriction mandating residential use among them, the Act exempts from extinguishment *all* covenants that apply to that general or uniform scheme of development. Thus, in accordance with defendants' statutory interpretation, all nine of Country Colony's covenants should be preserved because they together constitute a general or uniform scheme of development that restricts

---

Bridget Holdings, LLC. There is now a single plaintiff in this case, which is C Investments 2, LLC, and substituted party C Investments 4, LLC.

property within the subdivision to residential use. On the other hand, plaintiff construes this exception as applying to protect only those covenants that actually restrict property to residential use; under this view, only the subdivision's first covenant is exempted. The dissenting judge at the Court of Appeals interprets the Act as preserving those covenants which *either* restrict the property to residential use *or* permit only the construction of residential buildings of certain types upon the property and would exempt covenants one, two, and nine while extinguishing the remainder.

¶ 16        Based upon the plain language of the statute and the ordinary meaning of the words and phrases contained therein, as well as our own precedent in interpreting substantially identical language, we agree with plaintiff that N.C.G.S. § 47B-3(13) applies to preserve only the first of Country Colony's restrictive covenants.

**A. Plain Meaning and Ordinary Tools of Construction**

¶ 17        In our view, the plain words of N.C.G.S. § 47B-3(13) are unambiguous. Each sentence of this exception, read in harmony, combines with the others to carve out a limited exception for residential use restrictions occurring within the context of general or uniform schemes of development. The first sentence of the exception reads: "[M]arketable record title shall not affect or extinguish . . . [c]ovenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable." *Id.* § 47B-3.

¶ 18 "Ordinary rules of grammar apply when ascertaining the meaning of a statute, and the meaning must be construed according to the context and approved usage of the language." *Dunn v. Pac. Emps. Ins. Co.*, 332 N.C. 129, 134 (1992). We presume that the Legislature chose its words with due care and comprehension of their ordinary meaning. *See Sellers v. Friedrich Refrigerators, Inc.*, 283 N.C. 79, 85 (1973) ("In construing a statute, it will be presumed that the legislature comprehended the import of the words employed by it to express its intent.") (extraneity omitted).

¶ 19 By its plain language, the first sentence of N.C.G.S. § 47B-3(13) refers to covenants that "restrict" property to "residential use," provided that these covenants are (1) "applicable to a general or uniform scheme of development" and (2) "otherwise enforceable." N.C.G.S. § 47B-3(13). This construction of the statute is the most grammatically sound; it recognizes that "restrict" in its chosen form refers to the plural referent "covenants" as opposed to the singular referent "scheme of development," thus providing that the exception's scope is limited to those covenants that *restrict* property to residential use, as opposed to all covenants occurring within a scheme of development which *restricts* property to residential use. Moreover, the sentence's additional qualifications—that excepted covenants apply to "general or uniform schemes of development" and that they be "otherwise enforceable"—are not mere surplusage but provide important clarification for the exception as a whole.

¶ 20        The first qualification clarifies that the Marketable Title Act does not operate to disturb the common-law principle that only those covenants applicable to a general or uniform scheme of development, as opposed to personal covenants, may run with the land. *See Sedberry v. Parsons*, 232 N.C. 707 (1950); *Phillips v. Wearn*, 226 N.C. 290 (1946). This would not be the first time that the Legislature has chosen to codify the common-law into its general statutes. *See Cook v. Bankers Life & Cas. Co.,* 329 N.C. 488, 494 (1991) (Meyer, J., concurring in result) ("[A]s every lawyer knows, the legislature frequently enacts a statute which simply codifies existing common law, without any change whatsoever to the  common law it codifies."); *see, e.g., Ray v. N.C. DOT*, 366 N.C. 1, 6–7 (2012) (noting that the Legislature had codified the public duty doctrine and its exceptions as laid out by this Court in case law); *Giles v. First Va. Credit Servs.*, 149 N.C. App. 89, 105 (2002) (observing that the Legislature had "codified a right existing at common law."), *appeal dismissed and disc. rev. denied*, 355 N.C. 491 (2002).

¶ 21        The second qualification, requiring that the covenants be "otherwise enforceable," allows parties to continue to advance other arguments against the enforcement of restrictive covenants encumbering their property, such as plaintiff's own argument, alleged in its initial complaint, that "consistent, continuous violations" of the Newson restrictions by other landowners within the subdivision "and the passage of time have changed the condition of Country Colony and have

rendered the [Newson covenants] unenforceable." Despite defendants' contention that this "proviso was obviously intended to exclude 'racial' or other obnoxious restrictions from enforcement," courts have found, and under this provision may continue to find, residential use restrictions unenforceable for reasons unrelated to their particular substance. *See, e.g., Logan v. Sprinkle*, 256 N.C. 41, 47 (1961) (residential use restriction unenforceable under theory of abandonment when developers conveyed six of the eight lots in the development for the construction and operation of commercial enterprise); *Tull v. Drs. Bldg., Inc.*, 255 N.C. 23, 41 (1961) (considering whether laches, waiver, acquiescence, or estoppel prevents enforcement of residential use restrictions). Under the plain language of N.C.G.S. § 47B-3(13), courts may continue to refuse to enforce outdated restrictive covenants through the application of common-law doctrines entirely separate from the Act's statutory provisions.

¶ 22        The next sentence of N.C.G.S. § 47B-3(13) further belies defendants' interpretation. It reads: "The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use." N.C.G.S. § 47B-3(13).

¶ 23        "Because the actual words of the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189,

201 (2009). "Thus, in effectuating legislative intent, it is our duty to give effect to the words actually used in a statute and not to delete words used or to insert words not used." *Lunsford v. Mills*, 367 N.C. 618, 623 (2014). "Since a legislative body is presumed not to have used superfluous words, our courts must accord meaning, if possible, to every word in a statute." *N.C. Bd. of Exam'rs for Speech & Language Pathologists & Audiologists v. N.C. State Bd. of Educ.*, 122 N.C. App. 15, 21 (1996), *aff'd per curiam in part and disc. rev. improvidently allowed in part*, 345 N.C. 493 (1997) (per curiam).

¶ 24        As opposed to "numerical flip-flopping" serving no apparent purpose, this sentence's reference to a singular "excepted covenant" contemplates that individual covenants, rather than entire sets applicable to general or uniform schemes of development, be the subject of preservation under the exception. Defendants and amici here attempt to persuade us that this sentence of the statute serves to specify the appropriate residential use restrictions which may serve to allow entire sets of covenants applicable to a general or uniform scheme of development to be subject to the exception. But this sentence, grammatically and logically, reads that *individual* covenants are subject to exception ("*[t]he* excepted *covenant*") if and only if they fall within a narrow category of residential use restrictions.

¶ 25        Moreover, this narrow scope—allowing excepted covenants to "restrict the property to multi-family or single-family residential use or simply to residential use,"

N.C.G.S. § 47B-3(13)—conveys the General Assembly's intent that the exception go no further than to exempt those specific types of covenants. *See Campbell v. First Baptist Church*, 298 N.C. 476, 482 (1979) ("Under the doctrine of *expressio unius est exclusio alterius*, the mention of specific exceptions implies the exclusion of others."). Because the apparent purpose of this sentence is to provide the appropriate description of a residential use restriction to be excepted under N.C.G.S. § 47B-3(13), the sentence would be ineffectual if we read it to cover *all* covenants pertaining to a general or uniform scheme of development containing *any* form of residential use restriction *regardless* of each covenant's individual scope. We should not, and therefore do not, favor such a statutory interpretation under our well-established tenets of construction.

It is at this point that we also discount the Court of Appeals dissenting judge's interpretation of N.C.G.S. § 47B-3(13). *See C Invs. 2*, ¶ 44 (Dillon, J., concurring in part, dissenting in part). This Court's precedent establishes that restrictions against certain usages of property and restrictions against the development of structures of a particular nature upon property are not one and the same. *J.T. Hobby & Son, Inc. v. Fam. Homes of Wake Cnty., Inc.,* 302 N.C. 64, 74–75 (1981) (holding that "a provision in a restrictive covenant as to the character of the structure which may be located upon a lot does not by itself constitute a restriction of the premises to a particular use"); *Huntington v. Dennis*, 195 N.C. 759, 760–61 (1928) (per curiam)

(holding that the construction of an apartment building does not violate a residential use restriction because the building would be used for residential purposes only). "The Legislature is presumed to know the existing law and to legislate with reference to it." *State v. S. Ry. Co.*, 145 N.C. 495, 542 (1907). Because our decision in *Huntington* predates the passage of the Marketable Title Act in 1973, we presume that the Legislature was aware of these legal distinctions and thus of the significance of choosing to except residential use restrictions and not those permitting the construction of buildings of only a certain residential type.

¶ 27        Furthermore, our analysis of the restrictions at issue in *J.T. Hobby* and *Huntington* is derived from consideration of the same public policy principles motivating the passage of the Marketable Title Act—that land should be freed from unnecessary limitations against its use or alienation to the fullest extent feasible. *J.T. Hobby & Son,* 302 N.C. 64 at 70–71 ("[Restrictive] covenants are not favor[ed] by the law and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. [This rule] is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent.") (citations omitted). Although we readily concede that a statute's reference to restrictive covenants is not the same as a restrictive covenant itself, and is therefore not subject to the same mandate of strict construction, nonetheless we see no reason to diverge

from our established interpretation of substantially identical language to exempt covenants two and nine from the extinguishment provisions of the Marketable Title Act given (1) our aforementioned presumption that the Legislature acts with reference to established law, including our decision in *Huntington*, and (2) the Act's own mandate of liberal construction in favor of the simplification and facilitation of the transfer of real property.

¶ 28        The final sentence of Subsection 47B-3(13) reads: "Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B." N.C.G.S. § 47B-3(13). This sentence presents, in our view, the most ambiguity among the provisions, but neither interpretation shades in defendants' favor. The two potential interpretations are as follows: (1) Restrictive covenants, other than those mentioned herein, which limit the property to residential use only are not excepted from the provisions of Chapter 47B, or (2) Restrictive covenants other than those mentioned herein, which limit the property to residential use only, are not excepted from the provisions of Chapter 47B. The former choice serves to reiterate that only those residential use restrictions which occur within the context of a general or uniform scheme of development and are otherwise enforceable are preserved under the Marketable Title Act. The latter alternative serves to reinforce plaintiff's position—that the scope of N.C.G.S. § 47B-3(13) is sharply circumscribed to covenants that actually limited property to

residential use only and cannot be used to except covenants that do not relate to residential use.

¶ 29      Neither interpretation is dispositive and we do not wholly favor one reading over the other. On one hand, the lack of commas in this portion of the statute could imply that neither clause is intended to be non-restrictive, specifically, that both are intended to substantively limit or define the scope of "restrictive covenants." This analysis would favor the first interpretation because both phrases "other than those mentioned herein" as well as "which limit the property to residential use only" would serve to limit the meaning of "restrictive covenants" to those that concern residential use but are not otherwise covered by the exception. Under the second interpretation, however, the phrase "which limit the property to residential use only" would be non-restrictive because it would not meaningfully limit or define the scope of "restrictive covenants other than those mentioned herein" since *only* residential use covenants were mentioned therein. Either interpretation is, on some level, duplicative. However, instead of interpreting this final sentence of N.C.G.S. § 47B-3(13) as merely repeating the qualifications provided by the first sentence, we consider the distinct prospect that the Legislature had envisioned disputes exactly like the one at issue here and was attempting to foreclose them by reiterating its intention that only those covenants which actually restrict property to residential use and are otherwise

covered by the language of N.C.G.S. § 47B-3(13) would be excluded from the extinguishment provisions of the Act.

¶ 30          The dissent attempts to cast aspersions upon our interpretation of the clarity of the plain language of N.C.G.S. § 47B-3(13) and the customary interpretation of accompanying words, phrases, and punctuation in the statute by depicting our reference to the standard principles of statutory construction as some sort of concession to the correctness of the dissent's view that the language of the statute is ambiguous. In actuality, the converse is true: we emphasize the well-established guidelines of statutory construction, *not* because the law at issue is ambiguous, but in order to illustrate the established pathway by which we readily construe the statutory provision at issue and reach an outcome consistent with this Court's prior guidance which governs the proper interpretation of statutory law.

**B. Legislative Intent and Public Policy Principles**

¶ 31          "Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." *Burgess*, 326 N.C. at 209 (extraneity omitted). As it is our position that the language of N.C.G.S. § 47B-3(13) is clear and unambiguous, we need not go further in our analysis. However, we believe that it is worth observing that our interpretation of N.C.G.S. § 47B-3(13) comports with the public policy principles which motivated the passage of the Real Property Marketable Title Act, does not undermine the

purposes of the Act, and does not invite the ill consequences described by defendants and amici.

¶ 32 "In ascertaining [legislative] intent, a court may consider the purpose of the statute and the evils it was designed to remedy, the effect of the proposed interpretations of the statute, and the traditionally accepted rules of statutory construction." *Fletcher*, 370 N.C. at 327–28 (extraneity omitted). "The Court may also consider the policy objectives prompting passage of the statute and should avoid a construction which defeats or impairs the purpose of the statute." *O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 268 (2006) (extraneity omitted).

¶ 33 The intent of the legislative body which enacted the Real Property Marketable Title Act is expressly stated in the first passage of the statute:

> **§ 47B-1. Declaration of policy and statement of purpose.**
>
> It is hereby declared as a matter of public policy by the General Assembly of the State of North Carolina that:
>
> (1) Land is a basic resource of the people of the State of North Carolina and should be made freely alienable and marketable so far as is practicable.
>
> (2) Nonpossessory interests in real property, obsolete restrictions and technical defects in titles which have been placed on the real property records at remote times in the past often constitute unreasonable restraints on the alienation and marketability of real property.

(3) Such interests and defects are prolific producers of litigation to clear and quiet titles which cause delays in real property transactions and fetter the marketability of real property.

(4) Real property transfers should be possible with economy and expediency. The status and security of recorded real property titles should be determinable from an examination of recent records only.

It is the purpose of the General Assembly of the State of North Carolina to provide that if a person claims title to real property under a chain of record title for 30 years, and no other person has filed a notice of any claim of interest in the real property during the 30-year period, then all conflicting claims based upon any title transaction prior to the 30-year period shall be extinguished. (1973, c. 255, s. 1.)

N.C.G.S. § 47B-1.

¶ 34    In addition, the Legislature mandated a liberal construction in order to effectuate its purpose of simplifying and facilitating real property title transactions:

### § 47B-9. Chapter to be liberally construed.

This Chapter shall be liberally construed to effect the legislative purpose of simplifying and facilitating real property title transactions by allowing persons to rely on a record chain of title of 30 years as described in G.S. 47B-2, subject only to such limitations as appear in G.S. 47B-3. (1973, c. 255, s. 1.)

*Id.* § 47B-9.

¶ 35    In this Court's view, extinguishing outdated covenants such as the Newsons' falls squarely within the express purpose of the Marketable Title Act to summarily

extinguish "[n]onpossessory interests, . . . *obsolete restrictions* and technical defects in titles *which have been placed on the real property records at remote times in the past*" (emphases added) and which tend to be "prolific producers of litigation . . . caus[ing] delays in real property transactions and fetter[ing] the marketability of real property." *Id.* § 47B-1(3). The present case is illustrative of such a circumstance, wherein plaintiff's original complaint contained multiple theories upon which the trial court could have determined Country Colony's restrictive covenants to be unenforceable as applied to plaintiff's seven plots. Some would have required extensive factual inquiries into, for instance, the allegedly changed character of the subdivision and the disputed violations undertaken by defendants. By contrast, application of the Marketable Title Act properly resolved the dispute through summary judgment and in favor of more freely alienable and marketable title for both plaintiff and the Tillmans.

¶ 36    Our construction of N.C.G.S. § 47B-3(13) is in tandem with the statute's other provisions. Rather than stripping older neighborhoods of their character without recourse, the exception's limited applicability directs affected property owners to preserve their covenants through the procedures expressly afforded later in the Act. Residents of neighborhoods governed by sets of restrictive covenants who wish to preserve them may follow the procedure established by N.C.G.S. § 47B-4 in order to record a notice to be indexed in the relevant chains of title throughout their

community and to keep potential buyers on notice of the restrictions for another

thirty years to come:

> **§ 47B-4. Preservation by notice; contents; recording; indexing.**
>
> (a) Any person claiming a right, estate, interest or charge which would be extinguished by this Chapter may preserve the same by registering within such 30-year period a notice in writing, duly acknowledged, in the office of the register of deeds for the county in which the real property is situated, setting forth the nature of such claim, which notice shall have the effect of preserving such claim for a period of not longer than 30 years after registering the same unless again registered as required herein.

*Id.* § 47B-4(a).

¶ 37     This strikes us as the Legislature's intended balance between unburdening

real property from cumbersome nonpossessory interests including outdated

covenants and providing an avenue through which communities that continue to

abide by and rely upon their neighborhood's restrictive covenants could preserve

them. Indeed, by shifting the burden onto communities to take action to preserve non-

residential use covenants that are not contained within chains of title going back

thirty years by filing notices within the chains of all affected properties, the

Legislature could both (1) ensure that only those covenants that are actually valued

will continue to encumber property in the state while obsolete restrictions naturally

abate, and (2) effectuate the statute's purpose to simplify the title transfer process by

allowing purchasers of real property to determine the status of recorded real property

titles from an examination of recent records only. This is precisely the type of deliberate policy choice which is best left to the Legislature. Although the dissent claims to heed legislative intent while simultaneously attributing ambiguity to the Legislature's statutory enactment to justify the dissent's archaic approach, we adhere to the plain and unambiguous meaning of N.C.G.S. § 47B-3(13) while determining that it harmonized with the overarching purposes and provisions of the Marketable Title Act.

## III. Conclusion

We conclude that the Court of Appeals correctly held that all but the first of Country Colony's restrictive covenants as applied to plaintiff's property are to be extinguished under the Real Property Marketable Title Act and that the trial court correctly granted plaintiff's motion for summary judgment. We hold that a plain reading of N.C.G.S. § 47B-3(13) exempts from extinguishment only those covenants that actually require that a property be used residentially within the confines of a general or uniform scheme of development.

AFFIRMED.

Chief Justice NEWBY dissenting.

This case requires us to determine which types of restrictive covenants are excepted from extinguishment under N.C.G.S. § 47B-3(13) of the Real Property Marketable Title Act (the Act). Since the relevant statutory language is ambiguous, the intent of the legislature as expressed through our established rules of construction and the Act's purpose controls. When considering the reason behind the General Assembly's addition of subsection 13 and the Act's overall purpose, as well as giving every word meaning, it becomes apparent that the General Assembly intended to except from extinguishment entire sets of protective covenants under a general or uniform scheme of development which include a covenant restricting a subdivision to residential use. By eliminating all the protective covenants under a general or uniform scheme of development except the one restricting the property to residential use, the majority's decision today will destroy the character of many neighborhoods and communities across our state. I respectfully dissent.

On 28 February 1952, Henry G. Newson filed a plat map for a tract of real property that he and his wife owned in Mecklenburg County (Country Colony). Country Colony consisted of seventeen lots, with each being at least two acres. Before selling any of these lots, Newson filed a document which established the following protective covenants for Country Colony:

> 1. All lots in the tract shall be known and described and used for residential lots only.
>
> 2. No structure shall be erected, altered, placed or permitted to remain on any residential building plot other

than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage, and other outbuildings incidental to residential use of the plot.

3. No building shall be erected on any residential building plot nearer than 100 feet to the front lot line nor nearer than 20 feet to any side line.

4. No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

5. No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

6. No dwelling costing less than $10,000.00 shall be permitted on any lot in the tract. The ground floor area of the main structure, exclusive of one story open porches and open car ports, shall be not less than 1200 square feet in case of a one story structure. In the case of a one and one-half, two or two and one-half story structure, the ground floor area of the main structure, exclusive of one-story open porches or open car ports, shall not be less than nine hundred square feet. (It being the intention to require in each instance the erection of such a dwelling as would have cost not less than the minimum cost provided if same had been erected in January, 1952.)

7. A right of way and is and shall be reserved along the rear of each lot and along the side line of each lot where necessary, for pole lines, pipes and conduits for use in connection with the supplying public utilities service [sic] to the several lots in said development.

8. In the event of the unintentional violation of any of the building line restrictions herein set forth, the parties hereto reserve the right, by and with the mutual written consent of the owner or owners, for the time being of such

> lot, to change the building line restrictions set forth in this instrument; provided, however, that such change shall not exceed ten percent of the original requirements of such building line restrictions.
>
> 9. None of the lots shown on said plat shall be subdivided to contain less than two acres and only one residence shall be erected on each of said lots.

The Newsons then sold all seventeen lots in Country Colony and expressly subjected each conveyance to the protective covenants. Between 2016 and 2017, plaintiff C Investments 2, LLC, acquired seven contiguous parcels in Country Colony, derived from four of the original seventeen lots. Other than the original deeds from the Newsons, there was no specific reference to the protective covenants in any of the chains of title for the lots that plaintiff purchased. On 28 June 2018, plaintiff filed a complaint against defendants, the respective owners of the remaining lots in Country Colony, seeking a declaratory judgment that protective covenants 2 through 9 are void under the Act, which provides, in relevant part, as follows:

> **§ 47B-2. Marketable record title to estate in real property; 30-year unbroken chain of title of record; effect of marketable title.**
>
> (a)  Any person having the legal capacity to own real property in this State, who, alone or together with his predecessors in title, shall have been vested with any estate in real property of record for 30 years or more, shall have a marketable record title to such estate in real property.
>
> . . . .
>
> (c)  Subject to the matters stated in [N.C.]G.S.

[§] 47B-3, such marketable record title shall be free and clear of all rights, estates, interests, claims or charges whatsoever, the existence of which depends upon any act, title transaction, event or omission that occurred prior to such 30-year period. All such rights, estates, interests, claims or charges, however denominated, whether such rights, estates, interests, claims or charges are or appear to be held or asserted by a person sui juris or under a disability, whether such person is natural or corporate, or is private or governmental, are hereby declared to be null and void.

. . . .

**§ 47B-3. Exceptions.**

Such marketable record title shall not affect or extinguish the following rights:

. . . .

(13)　Covenants applicable to a general or uniform scheme of development which restrict the property to residential use only, provided said covenants are otherwise enforceable. The excepted covenant may restrict the property to multi-family or single-family residential use or simply to residential use. Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B.

N.C.G.S. §§ 47B-2(a), -2(c), -3(13) (2021).

Defendants Lawrence and Linda Tillman filed a crossclaim also challenging the validity of the same protective covenants. Defendants Arlene and Herbert Auger,

Eric and Gina Craig, and Stephen and Janice Ezzo[1] (appellants), however, sought to enforce the protective covenants. On 21 December 2018, C Investments 2, LLC, and defendants Lawrence and Linda Tillman (appellees) filed separate motions for summary judgment. The trial court entered an "Order Granting Plaintiff's And Tillmans' Motions for Summary Judgment" on 8 April 2019, concluding that N.C.G.S. § 47B-3(13) excepted from extinguishment only protective covenant 1 and that protective covenants 2 through 9 were thus null and void. Appellants appealed.

¶ 43        Before the Court of Appeals, appellants argued that "under N.C.[G.S.] § 47B-3(13), if a collection of covenants governing a uniform scheme of development include a restriction on residential use only, the Marketable Title Act exempts *all* covenants applying to that uniform scheme of development." *C Invs. 2, LLC v. Auger*, 277 N.C. App. 420, 2021-NCCOA-209, ¶ 16. In affirming the trial court's decision, the Court of Appeals reasoned that in subsection 13's first sentence, the phrase "which restrict," based on its plural form, must modify the plural word "covenants" rather than the singular phrase "scheme of development." *Id.* ¶ 17. Therefore, the Court of Appeals concluded that the exception in subsection 13 "applies only to 'covenants . . . which restrict the property to residential use only' and not to other covenants that are part of a general or uniform scheme of development and merely accompany a covenant restricting the property to residential use only." *Id.*

---

[1] The remaining defendants are not parties to this appeal.

¶ 44 The Court of Appeals also concluded that such "residential use only" covenants do not include related covenants governing the size and number of structures on a lot. *Id.* ¶¶ 18–19. It reasoned that subsection 13's next two sentences "further define the types of covenants that are subject to the statutory exception and expressly state that the exception is limited *solely* to those covenants restricting property to residential use, or more narrowly to multi-family or single-family residential use, and that it does *not* apply to other, related covenants." *Id.* ¶ 19. According to the Court of Appeals, the second sentence of subsection 13 indicates that the exception "applies solely to these specific covenants, not to other, related ones that might accompany these specific covenants as part of a uniform scheme of development." *Id.* ¶ 20. Finally, the Court of Appeals determined that subsection 13's third sentence "expressly indicates that the statute should *not* be read broadly and that it excepts only those covenants 'which limit the property to residential use.' " *Id.* ¶ 21 (quoting N.C.G.S. § 47B-3(13)). As such, the Court of Appeals concluded that protective covenants 2 through 9 are void and thus affirmed the trial court's order granting summary judgment in favor of appellees.

¶ 45 The dissenting opinion at the Court of Appeals agreed with the majority that subsection 13 excepts protective covenant 1. *Id.* ¶ 43 (Dillon, J., concurring in part and dissenting in part). It disagreed with the majority, however, by concluding that subsection 13 "describes both structural covenants and occupancy covenants; that is,

occupancy covenants which limit the use of property to occupancy by a single family *and* structural covenants which limit the use of property to the development of a single-family type residential structure." *Id.* ¶ 44. As such, the dissenting opinion would have held that subsection 13 also excepts "the portions of Country Colony's second and ninth covenants, *which restrict the use of each lot to a single-family residential structure." Id.* Appellants appealed to this Court based upon the dissenting opinion at the Court of Appeals. We also allowed appellants' petition for discretionary review to address subsection 13's applicability to other protective covenants within a residential scheme of development.

¶ 46        At this Court, the majority opinion adopts the reasoning of the Court of Appeals majority, holding that subsection 13 only excepts from extinguishment those covenants that specifically restrict a property to residential use only. Interestingly, the majority states that the language of N.C.G.S. § 47B-3(13) is clear and unambiguous. Their analysis, however, negates this conclusion and applies canons of statutory construction to interpret the language of the statute. This Court recently explained that "[a]ccording to well-established North Carolina law, '[w]hen the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning . . . .' " *State v. Carey*, 373 N.C. 445, 450, 838 S.E.2d 367, 372 (2020) (quoting *State v. Jackson*, 353 N.C. 495, 501, 546 S.E.2d 570, 574 (2001)). Accordingly, the majority

ultimately concedes that the language of the statute is ambiguous by resorting to statutory construction to interpret its meaning.

¶ 47        Indeed, this case raises an issue of statutory interpretation. *See Brown v. Flowe*, 349 N.C. 520, 523, 507 S.E.2d 894, 896 (1998) ("A question of statutory interpretation is ultimately a question of law for the courts."). "The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998)). "The best indicia of that intent are the language of the statute[,] . . . the spirit of the act[,] and what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs of Town of Nags Head*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citation omitted). Furthermore, the purpose of statutory construction is to ensure every word or phrase provides meaning and that none are surplusage. *E.g.*, *State v. Williams*, 286 N.C. 422, 431, 212 S.E.2d 113, 119 (1975). The relevant question, then, is whether, based upon the applicable statutory provisions, the General Assembly intended that the only covenants to survive extinguishment are those that explicitly restrict a property to residential use only.

¶ 48        "The Real Property Marketable Title Act was enacted by the General Assembly of North Carolina in an effort to *expedite* the alienation and marketability of real property." *Heath v. Turner*, 309 N.C. 483, 488, 308 S.E.2d 244, 247 (1983) (emphasis

added). In pursuit of this purpose, and relevant to the present case, the "cleansing

provision" of N.C.G.S. § 47B-2(c) "declare[s] . . . null and void" protective covenants

that exist solely due to "any act, title transaction, event or omission that occurred

prior to such 30-year period." N.C.G.S. § 47B-2(c). In response to concerns expressed

by Mecklenburg County residents that many residential neighborhoods outside

Charlotte's zoning jurisdiction would be stripped of their protective covenants,

however, the General Assembly included an exception for such covenants in

subsection 13. Edward S. Finley, Jr., Note, *Property Law – North Carolina's

Marketable Title Act – Will the Exceptions Swallow the Rule?*, 52 N.C. L. Rev. 211,

220 n.83 (1973) (hereinafter Note, *Marketable Title Act*). Specifically, subsection 13

excepts the following covenants from extinguishment:

> Covenants applicable to a general or uniform scheme of
> development which restrict the property to residential use
> only, provided said covenants are otherwise enforceable.
> The excepted covenant may restrict the property to multi-
> family or single-family residential use or simply to
> residential use. Restrictive covenants other than those
> mentioned herein which limit the property to residential
> use only are not excepted from the provisions of Chapter
> 47B.

N.C.G.S. § 47B-3(13).

¶ 49        When carefully reviewing subsection 13's language within the context of the

exception's purpose, it becomes apparent that the General Assembly intended to

except all the covenants that are part of a general or uniform "residential only"

scheme of development. The first sentence explains that in order for covenants to be excepted, they must meet three elements: (1) the covenants must be "applicable to a general or uniform scheme of development"; (2) the covenants must operate to "restrict the property to residential use only"; and (3) the covenants must be "otherwise enforceable." *Id.*

¶ 50 The third element requires that these covenants must not be void for some reason other than extinguishment under N.C.G.S. § 47B-2(c). In other words, none of the covenants can be unenforceable because they violate public policy. The majority's interpretation makes this element meaningless.

¶ 51 Regarding the first element, "[t]he primary test of the existence of a general plan for the development or improvement of a tract of land divided into a number of lots is whether substantially common restrictions apply to all lots of like character or similarly situated." *Sedberry v. Parsons*, 232 N.C. 707, 711, 62 S.E.2d 88, 91 (1950). As such, for a covenant to be excepted by subsection 13, it must first be part of a series of "substantially common restrictions" that apply to all "similarly situated" lots within a subdivided tract of land. *Id.*; *see* N.C.G.S. § 47B-3(13). The majority concedes that "Country Colony is indisputably governed by a series of protective covenants that provide for a general or uniform scheme of development as envisioned by its developers, the Newsons."

¶ 52 In order to meet the second element, these covenants must establish the

subject subdivision as one for "residential use only." N.C.G.S. § 47B-3(13). This element reveals an ambiguity within subsection 13. On the one hand, a hyper-literal reading of this element as adopted by the majority could mean that the only covenants excepted are those single covenants which specifically state that the subject property is limited to residential use only. This reading, however, seemingly contradicts the reason for subsection 13's existence and fails to effectively advance the Act's general purpose of expediting real property transactions. Furthermore, as previously discussed, this hyper-literal approach renders the "otherwise enforceable" clause meaningless. On the other hand, a more contextual reading of this element could mean that an entire set of covenants—i.e., those that comprise a general or uniform scheme of development—is excepted so long as it specifically restricts a subdivision to residential use only. This reading should be adopted because it more appropriately reflects the General Assembly's intent by addressing the reason behind subsection 13's addition while also advancing the Act's purpose. *See State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) ("When . . . a statute is ambiguous, judicial construction must be used to ascertain the legislative will. Furthermore, where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." (internal quotation marks and citations omitted)). The absurd result

here is the destruction of the character of neighborhoods and communities across North Carolina. Furthermore, proper statutory construction requires an interpretation that does not render meaningless any aspect of the statute.

¶ 53        Notably, the only other time a North Carolina court has considered subsection 13, it adopted this interpretation. In *Rice v. Coholan*, 205 N.C. App. 103, 695 S.E.2d 484 (2010), the Court of Appeals held the exception covered all restrictions applicable to a common scheme of development. The development at issue in *Rice* was restricted to residential purposes, however it also had restrictions governing the location, number, and architecture of any buildings constructed on the lots. *Rice*, 205 N.C. App. at 114, 695 S.E.2d at 491. The court noted the restrictions were "substantially common restrictions applicable to all lots of like character" and were a general plan of development. *Id.* at 114, 695 S.E.2d at 492. Accordingly, the court held the restrictive covenants were not extinguished by the Act and thus enforceable. *Id.*

¶ 54        As mentioned above, the Act was amended in committee to add subsection 13 in response to concerns from Mecklenburg County residents that many residential neighborhoods outside Charlotte's zoning jurisdiction would be stripped of their protective covenants. Note, *Marketable Title Act* at 220 n.83. In amending the statute to include the exception, "preservation of uniform residential sections through equitable servitudes, patterned to function like zoning ordinances, prevailed over notions favoring individual aspects of private ownership and court reluctance to

honor titles encumbered by equitable servitudes." *Id.* at 220.

¶ 55        Moreover, former Senator Michael P. Mullins, who introduced the amendment to add subsection 13, furnished an Appellate Rule 31 certificate for use by defendants' counsel to provide the following insight in the present case:

> My purpose and intent in proposing that amendment was to protect from extinguishment under the Marketable Land Title Act then under consideration all prior recorded residential covenants and restrictions applicable to a "general or uniform scheme of development", and not simply one such restriction that "restrict(s) the property to multi-family or single-family use or simply to residential use . . . (and) that's it. Anything else is gone," as the Court [of Appeals] had incorrectly concluded. To the contrary, my purpose and intent, and that of my proposed amendment – as expressed in the first sentence thereof – was to protect collectively all otherwise enforceable restrictive "covenants applicable to general or uniform schemes of development" restricting property for "residential use", and not simply those which limited such property to "multi-family or single-family use or simply to residential use," respectively.

Though one senator's statement does not establish the General Assembly's intent in adding subsection 13, it certainly is instructive when deciding between two clashing meanings of an ambiguous statute. The hyper-literal reading adopted by the majority ignores this legislative history. In doing so, the majority strips property owners of the very protective covenants that subsection 13 was designed to protect.

¶ 56        Furthermore, the General Assembly's purpose in promulgating the Act was "to *expedite* the alienation and marketability of real property." *Heath*, 309 N.C. at 488, 308 S.E.2d at 247 (emphasis added). The majority's approach, which results in a sort

of line-item vetoing of protective covenants that are part of a general or uniform scheme of development, does not accomplish this purpose. Rather, allowing substantially common covenants to remain valid does not add any burden on a purchaser of real property. Under the majority's test, that purchaser already has a duty to search his chain of title beyond the thirty-year threshold to find the covenant that specifically restricts the property to residential use only. Because that covenant must be part of a general or uniform scheme of development to be excepted, it will appear in the same document as the other related common covenants. As such, the title searcher will have found the entire scheme without any additional effort. Thus, a hyper-literal reading of the second element, namely, that the covenants must operate to "restrict the property to residential use only," does not advance the Act's purpose. Because the majority's approach contradicts the reason for subsection 13's existence and fails to advance the Act's general purpose, it is apparent that the more contextual reading, which allows all substantially common covenants within a residential use only subdivision to survive extinguishment, is more aligned with the General Assembly's intent.[2]

Moreover, subsection 13's second sentence reads: "The excepted covenant may

---

[2] This contextual reading is also more appropriate because it avoids a potential constitutional question regarding the extinguishment of property rights without notice or hearing. *See In re Arthur*, 291 N.C. 640, 642, 231 S.E.2d 614, 616 (1977) ("Where one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted."); *see also* U.S. Const. amend. V.

restrict the property to multi-family or single-family residential use or simply to residential use." N.C.G.S. § 47B-3(13). This sentence appears to clarify the inclusiveness of the "residential use only" requirement in the second element of the first sentence. In other words, the subject subdivision could include multi-family units only, single-family units only, or both. This sentence, however, does not say that the only covenants covered by subsection 13 are those single covenants that specifically limit a property to residential use. As such, the second sentence does not add another element that excepted covenants must meet but simply clarifies an already existing element within the first sentence.

¶ 58        The third and final sentence of subsection 13 states: "Restrictive covenants other than those mentioned herein which limit the property to residential use only are not excepted from the provisions of Chapter 47B." *Id.* This sentence explains that all restrictive covenants which fail to meet the elements laid out in the first sentence are subject to N.C.G.S. § 47B-2(c)'s cleansing provision. Notably, according to the common law,

> [a] restriction which is merely a personal covenant with the grantor does not run with the land and can be enforced by him only. . . . *In the absence of a general plan of subdivision[ ] development and sales subject to uniform restrictions*, restrictions limiting the use of a portion of the property sold are deemed to be personal to the grantor and for the benefit of land retained.

*Stegall v. Hous. Auth. of City of Charlotte*, 278 N.C. 95, 100–01, 178 S.E.2d 824, 828

(1971) (citations omitted). Therefore, the third sentence preserves this common law rule by clarifying that such personal covenants are extinguished under N.C.G.S. § 47B-2(c).

¶ 59　　Having clarified subsection 13's ambiguity, it is clear that all nine restrictive covenants for Country Colony meet subsection 13's three elements and are thus excepted from extinguishment under N.C.G.S. § 47B-2(c). As mentioned above, the third element is not at issue. The second element is satisfied because the first covenant explicitly states that "[a]ll lots in the tract shall be known and described and used for residential lots only." Thus, the covenants have the cumulative effect of creating a residential use only subdivision.

¶ 60　　The first element is also satisfied because all nine covenants are "applicable to a general or uniform scheme of development." N.C.G.S. § 47B-3(13). "The primary test of the existence of a general plan for the development or improvement of a tract of land divided into a number of lots is whether substantially common restrictions apply to all lots of like character or similarly situated." *Sedberry*, 232 N.C. at 711, 62 S.E.2d at 91. Here covenants 2 through 9 read as follows:

> 2. No structure shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage, and other outbuildings incidental to residential use of the plot.
>
> 3. No building shall be erected on any residential building plot nearer than 100 feet to the front lot line nor nearer

than 20 feet to any side line.

4. No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

5. No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

6. No dwelling costing less than $10,000.00 shall be permitted on any lot in the tract. The ground floor area of the main structure, exclusive of one story open porches and open car ports, shall be not less than 1200 square feet in case of a one story structure. In the case of a one and one-half, two or two and one-half story structure, the ground floor area of the main structure, exclusive of one-story open porches or open car ports, shall not be less than nine hundred square feet. (It being the intention to require in each instance the erection of such a dwelling as would have cost not less than the minimum cost provided if same had been erected in January, 1952.)

7. A right of way and is and shall be reserved along the rear of each lot and along the side line of each lot where necessary, for pole lines, pipes and conduits for use in connection with the supplying public utilities service [sic] to the several lots in said development.

8. In the event of the unintentional violation of any of the building line restrictions herein set forth, the parties hereto reserve the right, by and with the mutual written consent of the owner or owners, for the time being of such lot, to change the building line restrictions set forth in this instrument; provided, however, that such change shall not exceed ten percent of the original requirements of such building line restrictions.

9. None of the lots shown on said plat shall be subdivided

> to contain less than two acres and only one residence shall
> be erected on each of said lots.

Each of these covenants either governs the types and locations of buildings that can be erected on the lots, governs the types of activities permitted on the lots, creates rights of way, allows for alterations to existing building lines, or governs the size of the lots. As conceded by the majority, there is no question that these restrictions are "substantially common." *Id.* Moreover, none violate public policy, thus meeting the statutory test of being otherwise enforceable. Therefore, all of Country Colony's covenants fall within subsection 13's exception and should survive extinguishment under N.C.G.S. § 47B-2(c). *See* N.C.G.S. §§ 47B-2(c), -3(13).

Because subsection 13's language is ambiguous, this Court must avoid a hyper-literal reading and instead adopt a reading that gives every word meaning and appropriately considers the context and purpose behind the statute's promulgation. If this Court were to adopt such a contextual reading, it would see that the General Assembly intended to except from extinguishment those sets of protective covenants under a general or uniform scheme of development which collectively operate to restrict a subdivision to residential use. The Court of Appeals' decision should be reversed. Sadly, the majority's decision will likely result in the destruction of the character of neighborhoods and communities across North Carolina. I respectfully dissent.

Justices HUDSON and EARLS join in this dissenting opinion.